**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

Todd McGillivray,

                              Plaintiff,

v.

The Wells Fargo & Company Salary
Continuation Pay Plan,

                              Defendant.

Case No. 15-cv-04347-SRN-LIB

**DEFENDANT'S MEMORANDUM**
**IN SUPPORT OF ITS MOTION**
**FOR SUMMARY JUDGMENT**

## INTRODUCTION

Plaintiff Todd McGillivray ("Plaintiff") was an employee of Wells Fargo

Insurance Services USA, Inc. ("WFIS"). In 2014, WFIS began negotiating a sale of some

of its insurance offices, including the office where Plaintiff worked. As part of those

negotiations, WFIS ensured that its employees would each receive a comparable job offer

from the acquiring company that left them with the same or similar benefits, pay, and job

location. Plaintiff received just such a job offer. He turned it down, however, and quickly

found work with a different insurance agency.

Plaintiff now seeks a six-figure payout under The Wells Fargo & Company Salary

Continuation Plan (the "Plan")—a plan designed to provide limited compensation to

employees looking for work when certain job changes or displacements occur. He seeks

salary continuation pay even though he turned down a job offer that constitutes a

"Disqualifying Event" under the Plan and severs any right to such pay. In other words,

Plaintiff seeks salary continuation pay even though he did not need or qualify for the

limited compensation that the Plan makes available to employees who are forced to look for new work. The Plan's administrator reasonably concluded that the job offer Plaintiff received met the Plan's minimum criteria to disqualify Plaintiff from being entitled to salary continuation pay, because the offer was lucrative and exceeded the Plan's minimum criteria. Thus, the Plan administrator's claim denial did not, as a matter of law, constitute an abuse of discretion. Plaintiff's complaint should therefore be dismissed with prejudice.

## FACTS

### I.     The Parties.

Plaintiff worked for WFIS from 1990 to May 3, 2014. (Compl. ¶¶ 16, 17, Dkt. 1 ("Dkt. 1"); Ex. A.)[1] Plaintiff was a Senior Commercial Sales Executive with WFIS for 23 years, and at the time of his termination he worked in WFIS's Virginia, Minnesota office. (Dkt. 1 ¶ 2.) He was compensated by WFIS through "variable incentive pay," meaning he did not earn a salary from WFIS, but instead received commissions. (Ex. B at Resp. to Interrog. No. 4; Ex. C; Ex. A.) He was a solid performer, earning more than $200,000 in commissions during the final years of his employment in 2013 and 2014. (Ex. B at Resp. to Interrog. No. 3.)

WFIS is an affiliate of Wells Fargo & Company ("Wells Fargo"). (Dkt. 1 ¶ 3.) As such, WFIS was a participating employer in the Wells Fargo & Company Salary Continuation Pay Plan (the "Plan"). (Ex. D §§ 2.1, 2.19, 3.1.) The Plan provides salary

---

[1] All references to "Ex. __" are to the exhibits attached to the Declaration of Blake Lindevig filed herewith.

continuation pay to eligible employees when job changes or displacements occur for business reasons. (*Id.* Art. I; Ex. E at 2.)

## II.   The Plan Is Designed to Provide Salary Continuation Pay to Affected Employees Only in Limited Circumstances.

### A.   The Plan defines "Qualifying Events" and "Disqualifying Events."

The Plan provides salary continuation pay—ranging from 1 ½ to 16 months' worth of covered pay—to participants who face job changes or displacements. (Ex. D Art. I & App. A; Ex. E at 2, 8.) A participant becomes eligible for salary continuation pay if a defined "Qualifying Event" occurs. (Ex. D Art. 1.) These events include job loss, material changes in work location, or a reduction in base pay. (*Id.* §§ 2.23, 2.26.) There are also several types of "Disqualifying Events" that render a participant immediately ineligible for salary continuation pay. (*Id.* § 3.2.) Relevant to this dispute, a Disqualifying Event occurs when:

> [T]he Participating Employer enters into <u>a corporate transaction with another company</u> (including a transaction where another company acquires all or any portion of the assets, stock or operations of the Participating Employer), <u>and pursuant to the terms of the transaction</u>, the Participant is either continuously employed or <u>offered continued employment with the other company</u> whether or not the Participant accepts or declines the offer.

(*Id.* § 3.2(e) (emphasis added).) This type of Disqualifying Event is hereafter referred to as an "Offer of Continued Employment."

### B.  The Plan Administrator defined an "Offer of Continued Employment."

In June 2013 (and then later clarified in October 2014), the Plan Administrator issued an "Interpretation" applicable to "Corporation Transactions" under the Plan (the

"Plan Interpretation"). (Ex. F.) The Plan Interpretation was meant to support Wells

Fargo's overall strategy to negotiate the best terms possible on behalf of affected

employees. (*Id.* at 2.) It states: "Wells Fargo will continue the strategy of negotiating the

best terms possible for a more seamless transition for transferred employees, such as

matching severance protection for some period after close, grandfathering PTO levels

and/or higher total cash compensation opportunities." (*Id.*)

To encourage negotiation of terms favorable to affected employees, the Plan

Interpretation sets forth four minimum requirements a job offer must meet to constitute

an "Offer of Continued Employment" under the Plan, so that such offer will constitute a

Disqualifying Event:

1. Recognition of service credit with Wells Fargo prior to the transfer (the "Service Credit Requirement");

2. A benefits package that is similar to the benefit package provided by Wells Fargo prior to the transfer (the "Benefits Requirement");

3. A work location that is comparable to the one the employee had with Wells Fargo prior to the transfer (the "Work Location Requirement"); and

4. A base salary (or base pay rate) at least equal to the employee's base salary (or base pay rate) with Wells Fargo prior to the transfer (the "Pay Requirement").

(Ex. F.)

III.    **The WFIS / USI Transaction.**

In 2014, WFIS entered into an Asset Purchase Agreement to sell some of its

offices, including its Virginia, Minnesota office, to USI, Inc. (the "WFIS / USI

Transaction" or "Transaction"). (Ex. G Sched. 3.2 (a) (WF517, WF522); *id.* § 4.12(a) of

4

the Seller Disclosure Schedule (WF537, WF543).) As part of the Transaction, WFIS

negotiated terms that ensured USI would provide job offers to WFIS employees whose

positions would be eliminated as a result of the Transaction. (*See id.* Art. 7.) The Asset

Purchase Agreement required USI to make job offers that met the four requirements to

qualify as "Offers of Continued Employment" as set out in the Plan Interpretation. (*See*

*id.* §§ 7.1(a)(i), (ii), (iv) and 7.3(a).)

**A.      The WFIS / USI Communications to Affected Employees.**

USI and WFIS provided weekly newsletters to affected employees regarding the

pending WFIS / USI Transaction. These communications were referred to as "Updates

for Wells Fargo Insurance Team Members Transitioning to USI." (Ex. H.) The written

communications addressed questions regarding eligibility for salary continuation pay

under the Plan:

> What happens if I am provided an employment offer by USI?
>
> If your employment does not end sooner, you will remain a
> Wells Fargo team member through May 2, 2014 (based on the
> anticipated closing date). If you accept the offer, you will
> transfer to USI on May 3, 2014. If you do not accept or reply
> to the offer, your employment with Wells Fargo will end
> effective May 3, 2014. <u>Please note, you will not be eligible
> for a salary continuation pay package because your USI offer
> of employment is considered to be a comparable offer
> providing you prior service credit, the same level of base pay,
> a similar geographic location and a benefits program that
> includes retirement, medical, dental, and vision coverage.</u>

(*Id.* at WF203; *see also id.* at WF191 (emphasis added).)

**B.      USI Provided Plaintiff an Offer of Continued Employment.**

On March 20, 2014, USI provided Plaintiff a written offer of continued

employment ("USI's Offer" or "Offer"). (Ex. I.) USI's Offer satisfied the four

requirements of an "Offer of Continued Employment" under the Plan:

1. USI's Offer recognized the service credit Plaintiff had earned with WFIS before the transfer – satisfying the "Service Credit Requirement" (*see* Ex. G § 7.3(a); *see also* Ex. I § 3.5; *see also id.* at 1 (cover letter);

2. USI's Offer provided Plaintiff with a benefits package that was similar to the benefit package he received from WFIS before the transfer – satisfying the "Benefits Requirement" (*see* Ex. G §7.1(a)(iv); Ex. I § 3.5; *see also id.* at 1 (cover letter);

3. USI's Offer provided Plaintiff with a work location comparable to the one he had with Wells Fargo before the transfer – satisfying the "Work Location Requirement" (*see* Ex. G §7.1(a)(i); Ex. I §2.1 & n.1; *see also id.* at 1 (cover letter); and

4. USI's Offer provided Plaintiff a base pay rate at least equal to the base pay rate he had earned with WFIS prior to the transfer – satisfying the "Pay Requirement." (*See* Ex. G §7.1(a), (b); *id.* Sched. 7.1(b) of the Purchaser Disclosure Schedule (WF581-83); Ex. I §§ 3 through 5.)

USI gave Plaintiff until April 15, 2014, to accept its Offer. (Ex. I at 2 (cover

letter).) Plaintiff never responded. Plaintiff alleges that he "carefully considered" the

Offer and determined it was "far less favorable to him than his employment contract with

[WFIS]." (Dkt. 1 ¶ 15.) He claims that was the reason he "never responded" to USI's

Offer. (*Id.*) After Plaintiff declined USI's Offer by allowing it to lapse, USI decided not

to purchase WFIS's Virginia Minnesota, office and that office was eventually closed.

## IV. Plaintiff Accepted Employment with Another Insurance Agency, Settled Claims with WFIS, and then Brought a Claim for Salary Continuation Pay Under the Plan.

### A.   Plaintiff's New Employment and Release with WFIS.

After leaving WFIS in May 2014, Plaintiff quickly landed a job with another

insurance agency. (*Ex. J.*) About a month later, WFIS, Plaintiff, and his new employer began litigation over his move to the new insurance agency. (*Id.* at WF337-376.) The parties eventually settled their claims on a confidential basis. (*Id.*) As part of the settlement, Plaintiff agreed to a broad release in favor of WFIS and its affiliates (the "Release"). (*Id.* at WF356-57.)

**B.      Plaintiff's Administrative Claim For Salary Continuation Pay Under the Plan.**

Four days after executing the Release, on June 27, 2014, Plaintiff filed a claim for salary continuation pay with the Plan Administrator.[2] (Ex. K.) He complained that he had "not received any information regarding [his] eligibility to receive Pay Continuation benefits." (*Id.*) On August 28, 2014, Jill Fowler, Vice President, Corporate Employee Relations Consultant, acting on behalf of the Plan Administrator, denied Plaintiff's claim. (Ex. L.) Ms. Fowler explained that USI's Offer constituted a Disqualifying Event under the terms of the Plan. (*Id.* at 2.) She further referenced the April 14 and April 18, 2014, weekly newsletters that explained that affected employees would not be eligible for salary continuation pay if they received an offer of continued employment from USI. (*Id.*)

Plaintiff appealed the Plan Administrator's claim denial, challenging the determination that USI's Offer constituted an Offer of Continued Employment. (Ex. O.)

---

[2]      Plaintiff originally filed his claim on February 17, 2014, while the WFIS Virginia, Minnesota office was still open. (Ex. M.) On March 3, 2014, the Plan Administrator denied the claim because no Qualifying Event had yet occurred. (Ex. N.) Plaintiff never appealed that claim denial.

On December 11, 2014, the Plan's Appeals Committee, acting on behalf of the Plan Administrator, upheld the denial. (Ex. P.) The Appeals Committee also concluded that USI's Offer of employment constituted an Offer of Continued Employment and, therefore, was a Disqualifying Event that extinguished Plaintiff's eligibility for salary continuation pay. (*Id.* at 1.) Further, the Appeals Committee found that Plaintiff's claim was barred by the Release he signed. (*Id.* at 2.)

### C.   The Plan Administrator's Decision Is Supported By The Administrative Record.

The Plan Administrator's initial and final decisions to deny Plaintiff's claim comport with the Plan terms and are supported by the administrative record.

**USI's Offer was made pursuant to a "Corporate Transaction."** First, to constitute a Disqualifying Event under the Plan, there must be a "corporate transaction with another company" (a "Corporate Transaction") and "pursuant to the terms of this transaction" the affected employee must receive an "Offer of Continued Employment." (Ex. D § 3.2(e).) The WFIS / USI Asset Purchase Agreement provided that USI would acquire certain insurance offices from WFIS. (Ex. G at 3 (WF393); *id.* § 3.2(a) and Sched. 3.2(a) (WF517, WF524).) In addition, the Asset Purchase Agreement required that USI make offers of employment containing certain requirements – including an employment offer to Plaintiff. (*Id.* Art. 7.) This qualifies as a "Corporate Transaction" within the terms of the Plan.

**USI's Offer Constituted An "Offer of Continued Employment."** Second, to constitute a Disqualifying Event, USI's offer of employment to affected employees –

including USI's Offer to Plaintiff – must also meet the four requirements of an Offer of Continued Employment under the Plan and Plan Interpretation. The administrative record shows that USI's Offer to Plaintiff met those requirements:

Service Credit Requirement – The Asset Purchase Agreement between WFIS and USI provided that, had Plaintiff accepted USI's Offer, he would have received credit for his prior years of service with WFIS for purposes of the benefit plans offered by USI. (*Id.* § 7.3(a).) This satisfied the "Service Credit Requirement" in the Plan Interpretation.

Benefits Requirement – The Plan Interpretation defines a "similar" benefit package "as one containing all three of the following elements: health insurance (medical, dental and vision), retirement, savings or capital accumulation plan, and time off with pay." (Ex. F at 1.) Plaintiff does not contend USI's Offer lacked these benefit plans. (*See* Ex. I § 3.5 (Employment Agreement) and Ex. G §§ 7.1(a)(iv), 7.3(a).)

Work Location Requirement – It was not clear when USI made its job offer to Plaintiff whether WFIS's Virginia Minnesota, office would remain open following the WFIS / USI Transaction; that depended on whether Plaintiff accepted USI's Offer. Consequently, USI could not identify where Plaintiff's work location would be in its Offer. Instead, USI promised Plaintiff that his new work location would not involve a "Material Change of Work Location," which the Plan defines as follows:

> "Material Change of Work Location" means that all of the following occur: (i) the distance between your New Work Location and your last work location exceeds 20 miles (one way); (ii) the number of miles between your Home Address and your New Work Location exceeds the number of miles between your Home Address and your last work location (one way); and (iii) the number of miles between you Home Address and your New Work Location exceeds 40 miles.

(Ex. I at 1 (cover letter); *id.* at § 2.1 & n.1.) By promising that its Offer did not involve a "Material Change in Work Location," USI met the Plan's requirement that he receive a comparable work location. (*See* Ex. F at 1-2.)

Pay Requirement – The Plan Interpretation requires that USI's Offer provide a "base salary (or base pay rate) at least equal to the impacted team member's base salary (or base pay rate) prior to the transfer." (*Id.* at 1.) As a Senior Commercial Sales Executive with WFIS, Plaintiff earned commissions. (Ex. C; Ex. A; Ex. B at Response to Interrog. No. 4.) He was not paid a salary. This form of non-salary compensation (e.g. commissions) is referred to in the Plan Interpretation as "base pay rate." (Ex. F at 1.) Thus, under USI's Offer, Plaintiff was not offered a salary. Rather, USI's Offer proposed compensating Plaintiff in commissions and bonuses. (Ex. I §§ 3 through 5.)

The base pay rate USI promised to pay Plaintiff in USI's Offer was "at least equal to" the base pay rate WFIS paid Plaintiff before the USI Transaction. While USI's Offer would have paid a large portion of Plaintiff's compensation in the form of bonuses (as opposed to commissions) during his first four years of employment with USI, his base pay rate nevertheless would have been far greater during those years than the base pay rate he earned with WFIS before the WFIS / USI Transaction.

USI's commission structure was different than WFIS's structure. (Ex. O at 3-4.) For example, it increased the minimum threshold to earn commissions on renewal policies. (*Id.* at 3.) WFIS prepared an internal spreadsheet calculating the impact of the changed commission structure on Plaintiff's compensation, and projected he would lose $55,017 in renewal compensation. (Ex. Q.) Thus, WFIS negotiated with USI to ensure

that Plaintiff (and other affected employees) would be eligible to receive a commensurate bonus to make him whole. (Ex. G § 7.1 (b); *id.* § 7.1(b) of the Purchaser Disclosure Schedule (WF581-83).) Under USI's Offer, Plaintiff would have been eligible to earn an acquisition bonus (also referred to as "bridge compensation") equal to the projected impact to his renewal compensation, $55,017, payable in three payments over his first two years of employment. (Ex. I § 4.1(a).) Thus, Plaintiff would have received a total $165,051. (*Id.*)

In addition, USI provided Plaintiff the opportunity to earn a substantial retention bonus. (*Id.* § 5(a).) USI offered to pay Plaintiff a bonus equal to 110% of his average net commissions and fees in the first 24 months of employment. (*Id.* § 5(a) and (b).) WFIS projected Plaintiff's total retention bonus at $628,320, half payable in the beginning of his third year and the other half payable in his fourth year of USI employment. (*See id.* § 5(b); Ex. Q at 2.)

## STANDARD OF REVIEW

Under ERISA, a court will generally review a claim denial of plan benefits *de novo*, unless the plan gives the plan administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan, in which case deferential review applies. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989); *Menz v. Procter & Gamble Heath Care Plan*, 520 F.3d 865, 869 (8th Cir. 2008). Here, the Plan grants the Plan Administrator "the full, exclusive and discretionary authority to … make such rules, regulations, interpretations, computations, and construction of the terms of the Plan, determine all issues relating to eligibility for benefits … reconcile any

11

inconsistency, and take such other action to administer the Plan as the Plan Administrator in its discretion may deem appropriate." (Ex. D § 5.1.) Accordingly, the Plan Administrator's decision to deny Plaintiff's claim should be reviewed for abuse of discretion.

Under the abuse of discretion standard, the reviewing court "will uphold the [administrator's] decision to deny benefits if it is reasonable." *Maune v. Int'l Bhd. of Elec. Workers, Local No. 1 Health & Welfare Fund,* 83 F.3d 959, 962–63 (8th Cir. 1996). "We measure reasonableness by whether substantial evidence exists to support the decision, meaning 'more than a scintilla, but less than a preponderance.'" *Wakkinen v. UNUM Life Ins. Co. of Am.,* 531 F.3d 575, 583 (8th Cir. 2008) (quoting *Woo v. Deluxe Corp.,* 144 F.3d 1157, 1162 (8th Cir. 1998)). A reviewing court may not "substitute [its] own weighing of the evidence for that of the administrator," *Ferrari v. Teachers Ins. & Annuity Ass'n,* 278 F.3d 801, 807 (8th Cir. 2002), and a court "will not disturb a decision supported by a reasonable explanation even though a different reasonable interpretation could have been made." *Clapp v. Citibank N.A.,* 262 F.3d 820, 828 (8th Cir. 2001) (quotation marks omitted).

## **ARGUMENT**

**I.    PLAINTIFF'S FAILURE TO ACCEPT USI's OFFER WAS A "DISQUALIFYING EVENT" MAKING HIM INELIGIBLE FOR SALARY CONTINUATION PAY UNDER THE PLAN.**

### **A.    The WFIS / USI Transaction Constituted a "Corporate Transaction" Under the Plan.**

Plaintiff argues that the WFIS / USI Transaction was not a Corporate Transaction

sufficient to qualify as a Disqualifying Event. (Ex. O at 3; Ex. D § 3.2(e).) He does not argue that the Transaction does not constitute a "corporate transaction with another company" within the meaning of the Plan. It clearly does. Instead, Plaintiff seeks to insert a new term into the Plan – namely, that to qualify as a Corporate Transaction with respect to a particular affected employee (here, Plaintiff), the office where the affected employee worked must ultimately be <u>acquired</u> as part of the Corporate Transaction. The Plan does not include such a term.

Instead, the Plan provides that a Corporate Transaction involves a transaction "where another company acquires all <u>or any portion of</u> the assets, stock or operations of [WFIS]." (Ex. D § 3.2(e) (emphasis added).) That is what happened here. USI acquired some of WFIS's insurance offices. There is no requirement that the office where a particular employee worked be acquired as part of the transaction.

Plaintiff presumably makes this argument because USI eventually elected not to purchase WFIS's office in Virginia, Minnesota, where Plaintiff worked. (Ex. O at 3; Ex. D § 3.2(e).) This is irrelevant under the Plan. And, in any event, WFIS's Virginia, Minnesota office was identified in the WFIS / USI Asset Purchase Agreement as one of the offices USI intended to acquire. (Ex. G §§ 3.2(a) and (b); *id.* Scheds. 1.1(a), 3.2(a), 3.3(e) (WF499; WF517, 524, WF527-28); *id.* § 4.10(b) of the Seller Disclosure Schedule (WF537, 543); *id.* Annex L, Final Schedule (WF664, 669).) This is why Plaintiff was notified that WFIS had entered into an agreement with USI to "sell certain Wells Fargo Insurance offices, including the office where [Plaintiff] had worked." (Ex. L at 2.) And this is why USI was obligated to provide Plaintiff a job offer under the WFIS / USI Asset

Purchase Agreement. (Ex. G Art. 7.)

Indeed, it appears the reason USI did not ultimately acquire the Virginia, Minnesota office was because it had no reason to do so after Plaintiff declined USI's Offer. Plaintiff was a large producer of business at a small office location. (Ex. O at 1-2.) Without him, USI's acquisition of the Virginia, Minnesota office no longer made sense.

In short, the Plan does not require that USI acquire all of WFIS's assets to have the WFIS / USI Transaction qualify as a Corporate Transaction. It requires only that some portion of WFIS's assets be acquired, which they were. And, even if the Plan could be read as Plaintiff suggests, it is undisputed that the WFIS / USI Asset Purchase Agreement contemplated USI's acquisition of the Virginia, Minnesota office and that USI ultimately chose not to acquire that office after Plaintiff declined USI's Offer. As such, the WFIS / USI Transaction qualifies as a Corporate Transaction.

**B.     USI's Offer Constituted an "Offer of Continued Employment" Because It Included All Four Requirements Set Out In the Plan Interpretation.**

**1.     USI's Offer Satisfied the Prior Service Credit Requirement.**

Plaintiff has not argued or presented any evidence that USI's Offer failed to recognize his prior service credit at WFIS. Thus, Plaintiff cannot raise an argument about this now. *Bonczek v. Bd. of Trustees Nat'l Roofing Indus. Pension Plan*, 2016 WL 4098765, at *5 (D. Minn. July 28, 2016) (no abuse of discretion for failing to consider an argument participant did not make).

Even if Plaintiff had raised such an argument, the administrative record shows USI recognized Plaintiff's prior service credit. The WFIS / USI Asset Purchase Agreement

mandated that USI "shall recognize all service of the Transferred Employees." (Ex. G §
7.3(a).) In the weekly newsletters Plaintiff received about the upcoming WFIS / USI
Transaction, Plaintiff was notified that USI's Offer was considered "to be a comparable
offer providing you prior service credit." (Ex. H at WF191, WF203 (emphasis added).)
And, USI's Offer in fact stated that Plaintiff would receive prior service credit. (Ex. I at 1
(cover letter); *id.* § 3.5.)

### 2.  USI's Offer Satisfied the Benefits Requirement.

During the claims process, Plaintiff argued that USI's Offer contained a benefits
package that cost him more than the one he enjoyed at WFIS. (Ex. O at 5.) He also
complained that the 401(k) match at USI would have been less than WFIS's and that
USI's expense and mileage reimbursements would have been less than WFIS's. (*Id.* at 6.)
None of these arguments has any bearing on whether USI's Offer satisfied the Benefits
Requirement.

The Plan Interpretation requires that job offers provide a "benefits package that is
similar to the benefits package offered by Wells Fargo prior to the transfer." (Ex. F at 1.)
The Plan Interpretation defines a "similar" benefit package "as one containing all three of
the following elements: health insurance (medical, dental and vision), retirement, savings
or capital accumulation plan, and time off with pay." (*Id.*) All that matters is whether the
job offer contains these same benefit programs; the value or cost of those benefit
programs is irrelevant. (*Id.*)

Plaintiff does not dispute that USI's Offer contained the same benefit programs
identified in the Plan Interpretation. Indeed, he cannot dispute that because the WFIS /

USI Asset Purchase Agreement required USI to offer those benefit programs. (Ex. G §§ 7.1(a)(iv), 7.3(a); Ex. I § 3.5 and 1 (cover letter).) That USI's benefit programs may have been less generous or may have been more expensive for Plaintiff is irrelevant.

### 3. USI's Offer Satisfied the Work Location Requirement.

Plaintiff argues that the USI's Offer did not meet the Work Location Requirement because he "never received a specific office location address from USI." (Ex. O at 5.) This argument is without merit. USI's Offer undisputedly met the Work Location Requirement in the Plan Interpretation.

The Plan Interpretation states that an offer should ensure that an employee's "work location is comparable; and is not a material change in work location." (Ex. F at 1.) The Plan Interpretation states that a material change in work location occurs when:

1. The distance between the impacted team member's previous work location and the new work location exceeds 20 miles (one way);

2. The resultant commute (i.e. mileage) from home to the new location exceeds the impacted team member's commute to the previous work location (one way); and

3. The resultant commute from home to the new work location exceeds 40 miles (one way).

(Ex. F.) USI's Offer guaranteed Plaintiff that his work location with USI would not exceed these distance requirements. (Ex. I at 1 (cover letter); *id.* at § 2 & n.1.)

The reason USI's Offer made this guarantee is because the WFIS / USI Asset Purchase Agreement required USI to provide affected employees with a "Comparable Commute." (Ex. G § 7.1(a).) That phrase is defined as a "commute from such Employee's home … to [USI's] work location that would not result in a Material Change

16

of Work Location." (*Id.* at § 1.1 (WF395).) A "Material Change of Work Location" is

defined identically to the distance requirements set forth in the Plan Interpretation:

(i)     the distance between [USI's] work location and the last [WFIS] work location for such Employee exceeds 20 miles (one way);

(ii)    the number of miles between such Employee's home … and [USI's] work location exceeds the number of miles between such Employee's home and the last [WFIS] work location for such Employee (one way); and

(iii)   the number of miles between such Employee's home and [USI's] work location exceeds 40 miles.

(*Id.* (WF400).)

USI thus satisfied the Work Location Requirement by assuring Plaintiff in its

Offer that, while his work location was still being finalized, it would meet the definition

of "Comparable Commute" in the Asset Purchase Agreement. (Ex. I at 1 (cover letter).)

### 4.     USI's Offer Satisfied the Pay Requirement.

Finally, Plaintiff's complains that USI's Offer would have provided him with less

compensation than he received at WFIS. (Ex. O at 4-5.) This is simply wrong. In reality,

Plaintiff stood to receive greater compensation from USI had he accepted its Offer than

he received from WFIS.

The Pay Requirement in the Plan Interpretation provides that the affected

employee must receive "base salary (or base pay rate) [from the new employer] at least

equal to the impacted team member's base salary (or base pay rate) prior to the transfer."

(Ex. F at 1.) The term "base pay rate" in the Plan Interpretation, meanwhile, is a short-

hand version of the term "Annual Benefit Base Rate," which appears in the Plan. (Ex. B

17

at Resp. to Interrog. No. 7.) Under the Plan, "Annual Benefit Base Rate" is calculated by:

> aggregating the Participant's cash compensation (including salary, incentives and/or commission but excluding some forms of compensation such as draw, overtime pay, bonuses (including but not limited to hiring and retention bonuses)....

(*Id.*; Ex. D § 2.2.)

By contrast, in considering whether a job offer meets the Pay Requirement, the Plan Administrator "construes an impacted team member's <u>post</u>-transfer 'base pay rate' as <u>including</u> additional compensation." (Ex. B at Ex. A at .2 (emphasis in original and emphasis added).) Thus, when comparing Plaintiff's pre-transfer compensation with the post-transfer compensation he would have received from USI had he accepted its Offer, all cash compensation USI would have paid him must be considered – including all bonus payments. (*Id.*)

Here, the administrative record shows Plaintiff would have earned at least equal (and eventually greater) compensation – referred to as "Annual Benefit Base Rate" in the Plan and "base pay rate" in the Plan Interpretation – each year during at least the first four years of his employment with USI than he earned with WFIS in the year immediately preceding the WFIS / USI Transaction. This is because of the substantial bonuses Plaintiff would have received had he accepted USI's Offer, including the acquisition bonus and the retention bonus.

In his appeal letter, Plaintiff claimed that USI had a higher threshold for renewal commissions than WFIS had. (Ex. O at 4.) He is correct. USI would not pay him a commission on renewal premiums with a value less than $2,500. But WFIS was aware of

this, and negotiated with USI to ensure that USI would pay Plaintiff a bonus equal to the estimated shortfall in renewal commissions over Plaintiff's first three years of employment with USI (the "Acquisition Bonus"). (Ex. I § 4.) These lost commissions totaled $55,017 annually; thus, Plaintiff would have received that amount in three payments over the course of the first two years of employment (or a total of $165,051). (Ex. Q; Ex. I § 4.1(a).)

On top of this Acquisition Bonus, USI offered Plaintiff a retention bonus. (Ex. I § 5.) This bonus was calculated at 110% of Plaintiff's average net commissions and fees during his first 24 months with USI, for a projected total of $628,320 that would have been payable in two parts: (1) the first at the beginning of Plaintiff's third year, and (2) the second at the beginning of Plaintiffs' fourth year (the "Retention Bonus"). (Ex. Q; Ex. I §§ 5(a), (b).) Plaintiff would not have been eligible for any such Retention Bonus at WFIS.

Based on the two bonuses USI promised Plaintiff—which totaled **$793,371**—the Plan Administrator concluded that the compensation Plaintiff would have been received from USI would have been "far more lucrative than staying with WF[IS]." (Ex. R.) This conclusion was reasonable, and the Plan Administrator acted within its discretion in determining that USI's Offer met the Pay Requirement – namely, that Plaintiff would have earned at least the same level of base pay rate at USI as he earned at WFIS.

## II.     PLAINTIFF RELEASED HIS CLAIM FOR SALARY CONTINUATION PAY.

Plaintiff's claim should be dismissed for an additional reason, and that is because he executed a Release which bars his claim. Releases of claims are enforceable under ERISA if they are knowing and voluntary. *Mead v. Intermec Techs. Corp.*, 271 F.3d 715, 717 (8th Cir. 2001) (stating release of claims provided in exchange for severance benefits is enforceable under ERISA); *Leavitt v. Nw. Bell Tel. Co.*, 921 F.2d 160, 162 (8th Cir. 1990) ("A fiduciary and a beneficiary can settle a disputed claim that the fiduciary breached its fiduciary responsibilities under ERISA if the claim is knowingly and voluntarily released.").

Courts in the Eighth Circuit consider several factors to determine whether a release is knowing and voluntary: (1) the beneficiary's education and business experience; (2) the beneficiary's input in negotiating the terms of the settlement; (3) the clarity of the release language; (4) the amount of time the beneficiary had for deliberation before signing the release; (5) whether the beneficiary read the release and considered its terms before signing it; (6) whether the beneficiary knew of his or her rights under the plan and the relevant facts when he or she signed the release; (7) whether the beneficiary was given an opportunity to consult with an attorney before signing the release; (8) whether the beneficiary received adequate consideration for the release; and (9) whether the beneficiary's release was induced by improper conduct on the part of the employer. *Id.* at 162.

On or about June 23, 2014, Plaintiff executed a Release of claims in favor of Wells Fargo and its affiliates. (Ex. J.) The Release was very broad. It included "all damages, claims, actions and demands whatsoever, known or unknown, at such time which [McGillivray] may have against [Wells Fargo], including, but not limited to … any claims or counterclaims which could have been brought by… McGillivray as a result of the former employment relationship between [him] and Wells Fargo, and the Dispute, referenced in the Stipulation for Settlement in this case." (*Id.* at WF356.) The Release also included an exception for the following claims:

> any rights or entitlements of McGillivray … by virtue of [his] former employment with Wells Fargo, to retirement or other benefits, including any health benefits or extended rights under health insurance or other benefit policies and any obligation that Wells Fargo has to indemnify, hold them harmless and/or pay defense costs with respect to claims that may be asserted against them for actions they took while acting as agents in the employ of Wells Fargo, except cross-claims that may or could be made by [Plaintiff's new employer].

(*Id.* at WF357.)

Plaintiff was represented by competent counsel at the time he executed the Release. (*Id.* at WF346.) He stated in the agreement that he was advised to consult with an attorney, he voluntarily was entering into the agreement, and he was mentally competent. (*Id.* at WF339-40.) Plaintiff unequivocally agreed to release WFIS of all his claims. (*Id.* at WF356-57.) The only exception to this general release was for claims for "retirement or other benefits, including any health benefits or extended rights under health insurance or other benefit policies." (*Id.* at WF357.)

21

Plaintiff argues that the terms "other benefits" and "other benefit policies" within this exception includes The Wells Fargo & Company Salary Continuation Pay Plan. That is not correct. The Plan provides "salary continuation pay"—that is compensation, not "benefits" as that term is used in the Release. As the Release makes clear, the term "benefits" includes retirement benefits and health benefits. It does not include compensation.

## III.   PLAINTIFF'S MAXIMUM SALARY CONTINUATION PAY IS CAPPED AT $116,662.

Plaintiff claims that he is entitled to $191,285.98 in salary continuation pay. (Plf.'s Statement of the Case at 9 [Dkt. 10].) Plaintiff is not entitled to any salary continuation pay for the reasons discussed above. However, if Plaintiff were entitled to recover salary continuation pay, the Plan caps such pay at $116,662.

The Plan requires that the amount of an affected employee's salary continuation pay be determined by calculating the employee's "Covered Pay." (Ex. D § 4.2.) The method of calculation changes depending on whether a participant is paid by salary or under another structure, such as commissions. The pay structure for each employee is reflected in WFIS's Job Class Codes. Wells Fargo's human resources system assigns each employee one of three Job Class Codes. (*Id.* § 2.12.) Participants who are compensated annually by salary are classified as Job Class Code 2, and those that are paid in a manner other than salary (e.g. commissions) are assigned Job Class Codes 1 or 5. (*Id.* § 2.12.)

The administrative record shows that Plaintiff was classified as Job Class Code 5

and was paid by "variable incentive pay" (e.g. commissions)—not by salary. (Ex. A.)[3]

Plaintiff has been classified as Job Class Code 5 since 2010. Ex. S.) For participants

within this classification, Covered Pay is calculated using an employee's Annual Benefit

Base Rate. (Ex. D § 2.7.) An employee's Annual Benefit Base Rate is calculated each

quarter by aggregating certain cash compensation paid in the prior four quarters and

dividing the total by the number of months with compensation greater than zero. (*Id.* §

2.2.) The maximum Annual Benefits Base Rate for employees in Job Class Code 5 is

$100,000 (or $8,333 per month). (*Id.* § 2.2.)

Plaintiff completed 23 years of service at WFIS. (Dkt. 1 ¶ 17; Ex. K.) Employees

who have completed between 22 and 25 years of service are entitled to 14 months of

salary continuation pay. (Ex. D App. A.) Plaintiff's salary continuation pay under the

Plan would have been subject to the maximum limitation, which is $100,000 per year or

$8,333 per month. (*Id.* § 2.2.) Therefore, even if Plaintiff was entitled to salary

continuation pay (which he is not), the maximum compensation Plaintiff could have

received under the Plan would have been $8,333 per month multiplied by 14 months, for

a total of $116,662 in salary continuation pay.

---

[3]     In WFIS's human resources system, Plaintiff's "Current Salary Information" is
listed as "0.00." (*Id.*) That is because Plaintiff was paid by commissions, which included
draws and true-up payments. This was also reflected in his pay stubs. They are coded
with earnings characterized as a "DIB Sales Exec Draw" and "WFIS True-Up." (Ex. C.)

## <u>CONCLUSION</u>

For all of the foregoing reasons, the Plan respectfully requests that the Court grant summary judgment in favor of the Plan and dismiss Plaintiff's complaint on the merits and with prejudice.

Dated: March 16, 2017

*s/Steven L. Severson*

Steven L. Severson
MN Bar No. 152857
Blake J. Lindevig
MN Bar No.0392324
*Attorneys for Defendant The Wells Fargo &*
*Company Salary Continuation Pay Plan*
FAEGRE BAKER DANIELS LLP
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402-3901
Telephone: (612) 766-7000
Fax: (612) 766-1600
steven.severson@faegrebd.com
blake.lindevig@faegrebd.com

US.110457812.07