# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| Todd McGillivray,<br><br>            Plaintiff,<br><br>v.<br><br>The Wells Fargo & Company Salary Continuation Pay Plan,<br><br>            Defendant. | Case No. 15-cv-4347 (SRN/LIB)<br><br><br><br>**MEMORANDUM OPINION AND ORDER** |

Katherine L. MacKinnon and Sarah J. Demers, Law Office of Katherine L. MacKinnon PLLC, 2356 University Avenue West, Suite 230, St. Paul, Minnesota 55114, for Plaintiff.

Steven L. Severson, Faegre Baker Daniels LLP, 90 South Seventh Street, Suite 2200, Minneapolis, Minnesota 55402, for Defendant.

SUSAN RICHARD NELSON, United States District Judge

## I.    INTRODUCTION

This matter comes before the Court on the parties' cross-motions for summary judgment. (*See* Pl.'s Mot. for Summ. J. [Doc. No. 24]; Def.'s Mot. for Summ. J. [Doc. No. 15].) For the reasons that follow, the Court denies both motions without prejudice, and remands the matter to Defendant for further proceedings.

## II.   BACKGROUND

### A.    The Parties

Plaintiff Todd McGillivray worked for Wells Fargo Insurance Services USA, Inc.

("WFIS") from 1990 until his position was terminated on May 3, 2014.  (*See* Compl. [Doc. No. 1] ¶¶ 2, 16.)  At the time he was let go, McGillivray served as the Senior Commercial Sales Executive in WFIS's Virginia, Minnesota office.  (*See id.* ¶ 2.)  By all accounts, McGillivray was a successful insurance salesman.  In 2013, for instance, he was responsible for $655,170 in revenue for WFIS—nearly 97% of the total amount generated by the Virginia office.  (*See* Lindevig Decl. [Doc. No. 18], Ex G at WF669.)  McGillivray's success was reflected in his compensation, and in his final years with WFIS he routinely received more than $200,000 in commissions.[1]

WFIS—a non-party to this suit—is an affiliate of Wells Fargo & Company ("Wells Fargo").  As such, WFIS is a "Participating Employer" in the Wells Fargo & Company Salary Continuation Pay Plan (the "Plan").  (*See id.*, Ex D. §§ 2.1, 2.19, 3.1.)  The Plan serves to provide salary continuation pay—ranging from 1.5 to 16 months' worth of covered pay—to eligible participants who face job changes or displacements.  (*See id.*, Ex. D, Art. I; Ex. E at 2, 8.)  Such "Qualifying Events," as defined by the Plan, include job loss, material changes in work location, or a reduction in base pay.  (*See id.*, Ex. D §§ 2.23, 2.26.)  The Plan also provides for several types of "Disqualifying Events," however, that render a participant immediately ineligible for salary continuation pay.  (*See id.* § 3.2.)  As relevant to this dispute, a Disqualifying Event occurs when:

> [T]he Participating Employer enters into a corporate transaction with another company (including a transaction where another company acquires all or any portion of the assets, stock or operations of the Participating Employer), and

---

[1] Under WFIS's compensation structure, McGillivray received "variable incentive pay," meaning he did not earn a salary and was paid solely on a commission basis.  (*See* Lindevig Decl, Ex. B at 4-5.)

pursuant to the terms of the transaction, the Participant is either continuously employed or *offered continued employment with the other company whether or not the Participant accepts or declines the offer*.

(*Id.* § 3.2(e) (emphasis added).)  The Plan Administrator has further defined an "offer of continued employment" to exist where a job offer meets four minimum criteria:

1. Recognition of service credit with Wells Fargo prior to the transfer (the "Service Credit Requirement");

2. A benefit package that is similar to the benefit package provided by Wells Fargo prior to the transfer (the "Benefits Requirement");

3. A work location that is comparable to the one the employee had with Wells Fargo prior to the transfer (the "Work Location Requirement"); and

4. A base salary (or base pay rate) at least equal to the employee's base salary (or base pay rate) with Wells Fargo prior to the transfer (the "Pay Requirement").

(Lindevig Decl., Ex. F (the "Plan Interpretation").)

**B.     The USI Transaction**

On January 22, 2014, WFIS entered into an Asset Purchase Agreement ("APA") with USI Insurance Services LLC ("USI"), pursuant to which USI agreed to acquire a number of Wells Fargo's insurance office locations.  (Lindevig Decl., Ex. G at WF393.) One of the forty-two offices originally covered by the deal was the Virginia, Minnesota office where McGillivray worked.  (*See id.* at WF517.)  As part of the USI transaction, WFIS negotiated terms that ensured USI would provide job offers to WFIS employees whose positions would be eliminated as a result of the sale.  (*See id.* at WF436.)

McGillivray was duly offered a position with USI by letter dated March 20, 2014. (*See generally* Lindevig Decl., Ex. I.)  The offer letter included an Employment Agreement

3

which outlined the new position's responsibilities, compensation structure, and benefits. (*See id.*)  Although similar in some respects to McGillivray's position and compensation with WFIS, the USI Employment Agreement did contain several notable differences, the materiality of which will be discussed below.  First, although McGillivray would be entitled to the same employee benefits as similarly situated USI employees, these benefits were both less substantial and more costly than what McGillivray had received at WFIS.  (*See* Lindevig Decl., Ex. I at WF154-55; Ex. O at WF75-76.)  Indeed, by McGillivray's own calculations, the difference in cost alone was more than $600 per month.  (*See id.*, Ex. O at WF75.)  Second, although USI promised that McGillivray's new position would be based at an office with a "Comparable Commute"[2] to that required by his WFIS employment, it could not provide definitive notice as to where that office would be located.  (*See id.*, Ex. I at WF144.)  Third, USI retained the right to unilaterally change the terms of the Employment Agreement.  (*See id.* at WF154.)  In contrast, McGillivray's contract with WFIS could not be changed without both parties' consent.  (*See* Demers Decl. [Doc. No. 27], Ex. 1 at WF218.)

The biggest difference between the USI and WFIS contracts, however, came in the

---

[2] McGillivray's offer letter defined "Comparable Commute" to mean "a commute from your home address as scheduled in the Purchase Agreement (your 'Home Address') to the work location of USI or one of its subsidiaries (your 'New Work Location') that would not result in a Material Change of Work Location.  'Material Change of Work Location' means that all of the following occur: (i) the distance between your New Work Location and your last work location exceeds 20 miles (one way); (ii) the number of miles between your Home Address and your New Work Location exceeds the number of miles between your Home Address and your last work location (one way); and (iii) the number of miles between your Home Address and your New Work Location exceeds 40 miles." (Lindevig Decl., Ex. I at WF144 n.1.)

compensation structure, which for both companies was tied to commissions on sales. In general, USI's Employment Agreement provided for substantially lower commissions, as illustrated in the following chart:

| Sale Type | Commission at USI | Commission at WFIS |
|---|---|---|
| New Business | 40% | 50% |
| Renewal Business | 25% | 27% |
| Special Personal Lines | 40% new lines, 0% on renewals | N/A |
| Surety Bonds | 25% | 45% |

(*See* Lindevig Decl., Ex. I at WF153, 169; Ex. O at WF74.)  Further, USI required that accounts be worth a minimum of $2,500 on property and casualty insurance business, and $5,000 on employee benefits business, before the salesperson earned any commission at all. (*See id.*, Ex. I at WF153.)  No such minimum threshold existed on commissions at WFIS. (*See id.*, Ex. O at WF74.)  By McGillivray's own estimate, more than 87% of his accounts would have fallen below these threshold levels.  (*See id.*, Ex. O at WF71, 73.)

To offset these reductions in commission income, USI offered McGillivray two substantial bonuses that were intended to make up the difference between his USI and WFIS pay rates.  The first bonus, termed the "Acquisition Bonus," would be payable in three equal installments of $55,017 (for a total of $165,051), spread over the first two years of his employment with USI.  (*See id.*, Ex. I at WF155.)  The second bonus, known as the "Retention Bonus," would be paid in two installments in McGillivray's third and fourth years at USI, and would be equal to 110% of his average "Net Commissions and Fees"[3]

---

[3] The term "Net Commissions and Fees" refers to all commissions and fees received by USI, less any commissions paid to third parties, not commissions paid to McGillivray. (*See* Lindevig Decl., Ex. I at WF151.)  For example, although McGillivray was paid

earned over the second and third years of employment at USI.[4]  While the parties dispute how much money McGillivray stood to gain from the Retention Bonus, it would presumably have been several hundred thousand dollars.  (*See* Def.'s Resp. [Doc. No. 30] at 18-19.)

The record indicates that McGillivray carefully considered the USI employment offer, and ultimately concluded that it was "far less favorable to him than his employment contract with [WFIS]."  (*See* Compl. ¶ 15.)  In particular, he calculated that, under the USI commission structure, his income would decrease by more than $100,000 per year.  (*See* Lindevig Decl., Ex. O at WF75.)  While McGillivray recognized that this decrease would be partially offset by the two bonuses USI offered him, he felt that in the long-run the offer was not favorable to him.  (*See id.*)  Accordingly, McGillivray declined to accept USI's employment offer.  Perhaps because of this decision (although the record is silent on the matter), USI ultimately decided against purchasing the Virginia office when the APA closed

---

$216,730.09 in commissions in his final year at WFIS, the Net Commissions and Fees amount would have been $655,170—the amount of revenue McGillivray earned for WFIS.  (*See* Lindevig Decl., Ex. G at WF669.)

[4] The USI Employment Agreement sets forth the following illustration of how the Retention Bonus might operate:

> By way of example, if the Closing Date [of the APA] is May 1, 2014 and the Net Commissions and Fees are $900,000 for the twelve month period beginning May 1, 2015 and ending on April 30, 2016 and $1,000,000 for the twelve month period beginning May 1, 2016 and ending on April 30, 2017, Producer's aggregate Retention Payment would be $1,045,000 (the average of $1,000,000 and $900,000 equals $950,000, *multiplied* by 110% equals $1,045,000).

(Lindevig Decl., Ex. I at WF155.)

on May 2, 2014.[5]  (*See* Demers Decl., Ex. 7.)

### C.    McGillivray's Salary Continuation Benefits Claim

McGillivray's employment with WFIS was terminated on May 3, 2014.  (*See* Demers Decl., Ex. 1 at WF205.)  On June 27, 2014, McGillivray wrote to the Plan, informing them that his position was eliminated and requesting salary continuation benefits. (*See* Lindevig Decl., Ex. K.)  A Wells Fargo vice president, Jill Fowler, responded on August 28, 2014, denying McGillivray's claim.  (*See id.*, Ex. L.)  She explained that the Plan had determined that an offer of employment had been made to McGillivray by USI, and that all affected WFIS employees had been informed via newsletter that if they did not accept these offers of employment they would not be eligible for Plan benefits.  The denial letter stated in part:

> You were employed as a Senior Sales Executive Commercial at the time you were informed that [WFIS] entered into an agreement with [USI] to sell certain [WFIS] offices, including the office where you had worked.  This agreement was effective May 3, 2014.  Although you were offered continued employment with USI, you did not respond to that offer and therefore, your termination from Wells Fargo was also effective on May 3, 2014. . . .  Since [WFIS] entered into an agreement with [USI] to sell certain [WFIS] offices and you were offered continued employment with USI, this is considered a Disqualifying Event even though you did not respond to the offer of continued employment.

(*Id.*, Ex. L at WF78.)

McGillivray appealed the denial of his benefits claim to the Plan Appeals Committee by letter dated October 13, 2014.  (*See generally id.*, Ex. O.)  The detailed letter informed the Committee that, in McGillivray's view, he was entitled to salary continuation benefits

---

[5] The Virginia office was one of two offices of the original forty-two covered by the APA that was not ultimately purchased by USI.  (*See* Demers Decl., Ex. 7.)

7

for at least two reasons: (1) no "corporate transaction" had occurred affecting his work location, because the Virginia office was ultimately not included in the APA; and (2) even if a corporate transaction had occurred, McGillivray had not received an "offer of continued employment" because the USI position was not comparable to his WFIS position. (*See id.*, Ex. O at WF73-76.)  In support of the latter argument, McGillivray set forth several reasons why, in his view, the USI position did not meet the four criteria set forth by the Plan in the Plan Interpretation. (*See id.*)

The Plan Appeals Committee met in December 2014 to discuss McGillivray's appeal, and a final denial of benefits issued on December 11, 2014.  (*See* Demers Decl., Ex. 5.)  In relevant entirety, the denial letter stated as follows:

> As we understand the appeal, you believe your work location was not a part of the agreement between Wells Fargo and USI, a company with which Wells Fargo divested a portion of its operations.  And, you believe the subsequent offer from USI was not comparable, so you did not accept the terms.
>
> In fact, your work location was included as a part of the divestiture transaction agreement between Wells Fargo and USI by which USI acquired such operations.  You acknowledge, and the Committee has confirmed, that you did receive an offer from USI.  Therefore, you were not eligible for salary continuation benefits . . . .

(*See* Lindevig Decl., Ex. P at WF54.)   The Appeals Committee also contended that McGillivray had released any claims for salary continuation benefits by signing a settlement agreement relating to a dispute between WFIS and McGillivray's new employer, Otis-Magie Insurance Agency, Inc. ("O-M"). (*See id.* at WF55.)

In light of the Plan's denial of his benefits claim, McGillivray filed this lawsuit on December 11, 2015, pursuant to 29 U.S.C. § 1132(a)(1)(B).  Discovery closed on

November 21, 2016, and the parties subsequently cross-moved for summary judgment in March 2017. Oral argument was held on April 28, 2017, and the matter is now ripe for disposition.

## III. DISCUSSION

### A. Standard of Review

#### 1. Summary Judgment

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if it may affect the outcome of the lawsuit. *TCF Nat'l Bank v. Mkt. Intelligence, Inc.*, 812 F.3d 701, 707 (8th Cir. 2016). Likewise, an issue of material fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party bears the burden of establishing a lack of genuine issue of fact, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986), and the Court must view the evidence and any reasonable inference in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In responding to a motion for summary judgment, however, the nonmoving party may not rest on mere allegations or denials, but must "demonstrate on the record the existence of specific facts which create a genuine issue for trial." *Krenik v. Cty. of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995).

#### 2. Denial of Benefits

In general, a plan administrator's decision to deny benefits is reviewed *de novo*. *See*

*Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). "Where the plan grants the administrator or fiduciary 'discretionary authority' to determine eligibility for benefits, however, the standard of review is relaxed, and abuse of discretion becomes the appropriate benchmark." *Cooper v. Metro. Life Ins. Co.*, No. 16-3429, 2017 WL 2853729, at *4 (8th Cir. July 5, 2017) (citation omitted). Here, the Plan grants the Plan Administrator "the full, exclusive and discretionary authority to . . . determine all issues relating to eligibility for benefits," and the parties agree that this language is sufficient, on its face, to trigger the abuse of discretion standard. (*See* Lindevig Decl., Ex. D at WF36; Pl.'s Mem. in Supp. of Mot. for Summ. J. [Doc. No. 26] ("Pl.'s Mem.") at 19; Def.'s Mem. in Supp. of Mot. for Summ. J. Doc. No. 17] ("Def.'s Mem.") at 12.) *Cf. Cooper*, 2017 WL 2853729, at *4; *Waldoch v. Medtronic, Inc.*, 757 F.3d 822, 829 (8th Cir. 2014). Under this standard, the court will uphold a plan administrator's decision so long as it is based upon a reasonable interpretation of the Plan, and is supported by substantial evidence. *See Hampton v. Reliance Standard Life Ins. Co.*, 769 F.3d 597, 600 (8th Cir. 2014) (citing *King v. Hartford Life & Accident Ins. Co.*, 414 F.3d 994, 998-1000 (8th Cir. 2005) (en banc)). "A decision is reasonable if a reasonable person *could* have reached a similar decision, given the evidence before him, not that a reasonable person *would* have reached that decision." *Ingram v. Terminal R.R. Ass'n of St. Louis Pension Plan for Nonschedule Emps.*, 812 F.3d 628, 634 (8th Cir. 2016) (emphasis original) (citation and quotation omitted).

  In deciding whether an abuse of discretion has occurred, however, the Court must take into consideration any conflicts of interest that may color the impartial judgment of the plan administrator. *See Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 111 (2008) (citing

*Firestone*, 489 U.S. at 115). The Supreme Court has counseled that such a potentially relevant conflict of interest may exist where, as here, the same entity is ultimately responsible both for evaluating claims for benefits and for paying those claims that are approved. *See Glenn*, 554 U.S. at 112. Other factors that courts have identified as relevant to the abuse of discretion analysis include whether the administrator's actions suggest procedural unreasonableness; whether the plan has failed to assess all evidence presented to it; and whether the administrator has improperly relied only on evidence favorable to a denial of benefits. *See, e.g.*, *Glenn*, 554 U.S. at 116-118; *Chronister v. UNUM Life Ins. Co. of Am.*, 563 F.3d 773, 777 (8th Cir. 2009). In all cases, however, the weight to be afforded to these and other considerations will depend upon the evidence presented to the Court. *See Cooper*, 2017 WL 2853729, at *4-5.

### B. The Sufficiency of the Record Before the Court

In their briefs and at oral argument, the parties have presented multiple issues that they suggest are ripe for resolution by this Court. Among other matters, they raise questions as to the proper weight to be afforded to the Plan's inherent pecuniary conflict of interest; whether McGillivray released any claims he might have for salary continuation benefits as part of the O-M settlement agreement; whether the ultimate non-sale of the Virginia office to USI still constituted a "corporate transaction" under the terms of the Plan; and, even if it did, whether the position offered to McGillivray by USI was comparable to his WFIS employment under the four criteria listed in the Plan Interpretation. Each of these issues has received careful, detailed treatment.

An important threshold question for the Court, however, is whether the present

record is sufficient to allow the Court to conduct its statutorily mandated role of judicial review.  Of particular relevance, ERISA provides that all employee benefit plans must:

> (1) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant, and
>
> (2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.

29 U.S.C. § 1133.  Interpreting this statutory mandate, the Department of Labor has issued regulations setting forth several "minimum requirements" that must be met by plans in reviewing claims for benefits.  29 C.F.R. § 2560.503-1(a).  Most notably for purposes of this matter, plans must provide claimants with "a reasonable opportunity to appeal an adverse benefit determination to an appropriate named fiduciary of the plan, and under which there will be a full and fair review of the claim and the adverse benefit determination."  *Id.* § 2560.503-1(h)(1).  Such an appeal is only "full and fair" if, among other things, it "provides for a review that takes into account all comments, documents, records, and other information submitted by the claimant relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination."  *Id.* § 2560.503-1(h)(2)(iv).  The claim regulations further require the plan administrator to set forth the "specific reason or reasons for the adverse determination," and provide "[r]eference to the specific plan provisions on which the benefit determination is based."  *Id.* § 2560.503-1(j).  The purpose of these requirements is both to ensure careful consideration of claims on the merits, and to facilitate any necessary judicial review.  *See*

*Abram v. Cargill, Inc.*, 395 F.3d 882, 886 (8th Cir. 2005); *Richardson v. Cent. States, Se. & Sw. Areas Pension Fund*, 645 F.2d 660, 665 (8th Cir. 1981).

Reinforcing the requirements of ERISA and the DOL claim regulations, the Eighth Circuit (as well as several other courts) has held that claimants are entitled to more than bare-bones, conclusory denials of claims or of appeals. Most notably, in *Richardson v. Central States, Southeast and Southwest Areas Pension Fund*, the Eighth Circuit rejected as inadequate an appeal decision that did little more than state that the appeals committee had reviewed the claimant's petition and found it to lack merit, citing to a single provision of the plan as the proffered rationale. In the court's view, the paucity of detail provided by the committee fell "well short of the level of acceptability" required under ERISA. 645 F.2d at 665. What was required, the court declared, was "a written opinion that includes specific reasons for the decision," and "[b]ald-faced conclusions [did] not satisfy this requirement." Going forward, the plan trustees were "obligated to set out in opinion form the rationale supporting their decision so that [the claimant] could adequately prepare himself for any further administrative review, as well as an appeal to the federal courts." *Id.* The Eighth Circuit's holding in *Richardson* has been widely echoed by the other circuit courts. *See, e.g.*, *Halpin v. W.W. Grainger, Inc.*, 962 F.2d 685, 693 (7th Cir. 1992) ("[A] claimant is entitled by statute to a 'full and fair review' of a denial of benefits, and, in order to permit such a review, the notice of decision must include specific reasons. This requirement ensures that a full and fair review is conducted by the administrator, enables the claimant to prepare adequately for appeal to the federal courts or further administrative review, and makes it possible for the federal courts to perform the task, entrusted to them by ERISA, of

13

reviewing that denial.") (internal citations omitted); *see also Schadler v. Anthem Life Ins. Co.*, 147 F.3d 388, 394 (5th Cir. 1998); *Weaver v. Phoenix Home Life Mut. Ins. Co.*, 990 F.2d 154, 158 (4th Cir. 1993); *White v. Jacobs Eng'g Grp. Long Term Disability Benefit Plan*, 896 F.2d 344, 350 (9th Cir. 1989).

In light of these regulatory and judicial guideposts, the Court cannot but conclude that the Plan failed to discharge its duty to provide a "full and fair review" of McGillivray's claim appeal. The record demonstrates that upon receiving the initial denial letter, McGillivray crafted a thorough, detailed appeal setting forth several independent bases for why he felt the denial was in error and he should be entitled to salary continuation benefits. (*See generally* Lindevig Decl., Ex. O.) Among other arguments, McGillivray contended that there was no Disqualifying Event under the terms of the Plan because there was no "corporate transaction" affecting his office (which was not ultimately transferred to USI). (*See id.* at WF73.) Even if there was a corporate transaction, however, McGillivray further asserted that there was no "offer of continued employment," as defined by the Plan Interpretation. In particular, he argued that three of the four criteria delineated by that interpretation—equal pay rate, similar benefits package, and a comparable work location—were missing from the offer he received from USI. (*See id.* at WF74-76.) For each of these arguments, McGillivray provided detailed factual support.

Because under the Plan, a Disqualifying Event requires *both* a corporate transaction *and* an offer of continued employment meeting *each* of the four Plan Interpretation criteria, it was incumbent upon the Plan Appeals Committee, in responding to McGillivray's appeal, to provide a clear explanation as to why it felt his arguments were unmeritorious. *See*

*Richardson*, 645 F.2d at 665.  But the Plan did no such thing.  While the appeal denial letter correctly summarizes McGillivray's belief that there was no corporate transaction and no offer of continued employment under the terms of the Plan, it goes on to address these arguments in only two brief, conclusory sentences:

> *In fact, your work location was included as part of the divestiture transaction agreement between Wells Fargo and USI whereby USI acquired such operations.  You acknowledge, and the Committee has confirmed, that you did receive an offer from USI.  Therefore, you were not eligible for salary continuation benefits . . . .*

(Lindevig Decl., Ex. P at WF54 (emphasis added).)

Importantly, neither sentence provides the *reasons* underlying the Committee's decision, and the Committee's conclusions themselves are patently non-responsive to McGillivray's arguments.  *Cf. Anderson v. Nationwide Mut. Ins. Co.*, 592 F. Supp. 2d 1113, 1128-29 (S.D. Iowa 2009) ("Because the notification does not set forth the relevant facts, it does not contain sufficient detail by which [the plaintiff], or this Court, can surmise why the administrator found [the plaintiff]'s evidence and arguments unpersuasive.").  Most pertinently, while the Committee is correct that McGillivray acknowledged receiving an offer from USI, that fact alone does not mean that the offer was *comparable* under the four Plan Interpretation criteria.  Literally nowhere does the appeal denial letter discuss (or, for that matter, even mention) these criteria, let alone set forth why the Committee felt that the USI offer met their requirements.  (*See generally id.* at WF54-55.)  Without that inquiry, the bare existence of an offer does nothing to demonstrate a Disqualifying Event for purposes of the Plan.  *Cf. Anderson*, 592 F. Supp. 2d at 1128 (rejecting as inadequate claim denial that "[a]t no point . . . acknowledge[s], much less address[es]" the plaintiff's arguments in favor

of his claim).

The conclusory nature of the Appeals Committee's decision, coupled with its complete lack of detail, renders it inadequate under the requirements of 29 C.F.R. § 2560.503-1 and *Richardson*. Even the most prescient plaintiff would be unable, based on the letter alone, to approach a civil action with confidence that he actually understood why his claim had been denied. Just as importantly, no district court could conduct a reasoned review of the Appeals Committee's decision-making for purposes of abuse of discretion review, because there is no indication as to which factors or documents the committee actually considered, why it found McGillivray's arguments lacking, or what principles formed the basis of its decision. Any decision of the court would be based purely on speculation or on the post hoc arguments of the Plan's lawyers, which do not provide a sound basis for a ruling. *See Marolt v. Alliant Techsystems, Inc.*, 146 F.3d 617, 620 (8th Cir. 1998) ("We will not permit ERISA claimants denied the timely and specific explanation to which the law entitles them to be sandbagged by after-the-fact plan interpretations devised for purposes of litigation."); *Short v. Cent. States, Se. & Sw. Areas Pension Fund*, 729 F.2d 567, 575 (8th Cir. 1984) ("A *post hoc* attempt to furnish a rationale for a denial of . . . benefits in order to avoid reversal on appeal, and thus meaningful review, [is not acceptable]."). As the Supreme Court has recently noted, "courts cannot exercise their duty of substantial-evidence review unless they are advised of the consideration underlying the action under review." *T-Mobile S., LLC v. City of Roswell*, 135 S. Ct. 808, 815 (2015) (internal brackets and citation omitted).

Because the Plan failed to comply with the requirements of 29 U.S.C. § 1133 and 29

16

C.F.R. § 2560.503-1, its denial of benefits was an abuse of discretion and must be reversed.[6]

*See Wiwel v. IBM Med. & Dental Benefit Plans for Regular Full-Time & Part-Time Emps.*, No. 5:15-cv-504-FL, 2017 WL 1184066, at *(E.D.N.C. Mar. 29, 2017). Under Eighth Circuit precedent, however, the "appropriate remedy for a violation of 29 U.S.C. § 1133[] and the Claims Regulation is [generally] not an award of benefits by the court, but rather a remand to the plan administrator so that the claimant gets the benefit of a full and fair review." *Grasso Enters., LLC v. Express Scripts, Inc.*, 809 F.3d 1033, 1039 (8th Cir. 2016) (citation and quotation omitted). Accordingly, the Court will remand the matter to the Plan for the limited purpose of allowing it to clarify or reconsider its decision to deny McGillivray's claim for benefits. *See Wiwel*, 2017 WL 1184066, at *9. In doing so, the Plan should address each of McGillivray's arguments in favor of his claim and, if it still chooses to deny benefits, provide a detailed explanation of the reasoning underlying that decision. *See* 29 C.F.R. § 2560.503-1(g), (j). "Should procedural deficiencies noted in this order persist in [a] future action for administrative review, an award of benefits may be warranted." *Wiwel*, 2017 WL 1184066, at *9.

---

[6] The Court notes that the Plan has half-heartedly argued that McGillivray released his claim for salary continuation pay when he signed the O-M settlement agreement. (*See* Def.'s Mem. at 20-22.) Seemingly, this action would obviate the need for a careful consideration by the Plan of the substantive merits of McGillivray's benefits claim. However, even a cursory review of the settlement language makes clear that the release contained an exception for "any rights or entitlements of McGillivray . . . by virtue of [his] former employment with Wells Fargo, to retirement or *other benefits*, including any health benefits or extended rights under health insurance or *other benefit policies* . . . ." (*See* Lindevig Decl., Ex. J at WF357.) In light of this plain language, the Court observes that the Plan prudently did not raise this argument at the motion hearing. In any event, the Court finds that the O-M settlement did not constitute a release of McGillivray's claim to benefits under the Plan, and thus the agreement does not affect its analysis of the sufficiency of the Plan's benefits denial procedures.

## IV. ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Plaintiff's Motion for Summary Judgment [Doc. No. 24] is **DENIED** without prejudice;

2. Defendant's Motion for Summary Judgment [Doc. No. 15] is **DENIED** without prejudice; and

3. Defendant's decision to deny Plaintiff salary continuation benefits is **REVERSED** and the matter is **REMANDED** to the Plan for further proceedings consistent with this Order.

Dated: July 18, 2017                                       s/Susan Richard Nelson
                                                          SUSAN RICHARD NELSON
                                                          United States District Judge